UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROBERT W. FROST,

                                      Plaintiff

DECISION AND ORDER

-vs-

04-CV-6620 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,

                                      Defendant.

_____

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Robert W. Frost, Jr., *pro se*<br>4195 Lake Avenue<br>Rochester, New York 14612 |
| For the Defendant: | Brian McCarthy, Esq.<br>Assistant United States Attorney<br>Western District of New York<br>100 State Street<br>Rochester, New York 14614 |

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied plaintiff's application for disability insurance benefits. Now before the Court is defendant's motion for judgment on the pleadings [#10]. For the reasons stated below, defendant's motion is denied, and this matter is remanded for further administrative proceedings.

1

PROCEDURAL BACKGROUND

Plaintiff applied for SSI benefits on January 10, 2001, claiming to be unable to work due to mental illness, including depression, anxiety attacks and panic attacks, as well as back pain. (59, 64)[1]  The Social Security Administration denied the application on June 12, 2001. (31)  An administrative hearing was held on March 11, 2003, before an Administrative Law Judge ("ALJ").  The ALJ issued a Decision and Order on May 21, 2003, finding that plaintiff was not disabled. (14-22)  Plaintiff sought review from the Appeals Council, which denied his request on October 23, 2004. (5-6)  Plaintiff commenced the instant action on December 17, 2004.

FACTUAL BACKGROUND

At the time of the hearing in this matter, plaintiff was 50 years old, and had a high school (GED) education.  Plaintiff had not worked a regular job for over ten years, and had been jailed several times for various crimes including petit larceny and burglary.  Plaintiff lived with his mother until her death in 2000 or 2001. Subsequently, he lived by himself in an apartment.  Plaintiff claimed to be unable to go shopping because of anxiety about being around other people, and he also claimed to be unable to perform housework.  Plaintiff indicated that he was helped with shopping and housework by a female friend.  Plaintiff claimed to spend his days doing very little besides occasionally visiting friends and gathering junk to sell.  Plaintiff received welfare benefits, and claimed to earn enough money from selling junk to pay for gas and insurance for his truck, as well as a two-pack-a-day cigarette habit.

---

[1] Unless otherwise indicated, citations are to the Administrative Record.

Plaintiff had been involved in numerous fights during the relevant period.[2] For example, in February 2001, plaintiff told his therapist that, "in the last month, he has had two episodes of anger, during one episode he did hit another person." (216) Plaintiff was involved in a fight with two other people in or about August 2001, in which he sustained injuries to his face and forehead. (278) On October 21, 2001, plaintiff reported having a fight with two neighbors. (275)  On or about November 16, 2001, plaintiff reported having been in a fight, in which he injured his shoulder after throwing numerous punches. (295) In April 2002, plaintiff was involved in a shoving match with a neighbor over a dent in plaintiff's car. (263)  Plaintiff was involved in another fight in May 2002 and, as a result, suffered internal injuries requiring surgery.  In July 2002, he was involved in yet another fight and sustained injuries to his face.  (260, 289)

## MEDICAL EVIDENCE

Plaintiff received treatment for his mental illness from psychiatrist Kashinath Patil, M.D. (" Patil") and therapist Robert Eklund, RN ("Eklund").  On December 22, 1998, Patil completed a report in which he stated that plaintiff suffered from "intermittent explosive disorder", and that as a consequence, he was "moderately limited" in his ability to carry out instructions and interact appropriately with others, and "very limited" in his ability to maintain socially appropriate behavior and to function in a work setting. (148) Patil reported that plaintiff had poor impulse control, resulting in a history of assaultive behavior, including an assault on a customer when he was working as a landscaper. (149)

---

[2]It is undisputed that the relevant period is from January 10, 2001, the date plaintiff filed his SSI application, through May 21, 2003, the date of the hearing before the ALJ.

> On April 1, 1999, Patil completed another report, in which he stated:
>
> [Patient] has difficulty maintaining socially appropriate behavior when dealing [with] people [due to] poor impulse control. [History] of assaulting a customer when [he] had [his] own landscaping business years ago.  Has problem [with] authority figures.  Assault charge for punching a cop in 1984.  Would probably not do well in a work setting.

(153)  Patil further noted that plaintiff "had recent physical assault towards a man [due to] road rage.  The man did not file charges [and] law not involved. [Plaintiff] demonstrates several discrete episodes of failure to resist aggressive impulses that result in destruction to property.  Has constant [complaint of] nervousness [and] expresses social phobia." (150)

On February 19, 2001, Douglas C. Evans, M.D. (" Evans"), apparently a treating psychiatrist associated with Patil's pratice, completed a report in which he stated that plaintiff "needs continued 1:1 psychotherapy to manage his anger." (190) Evans opined that, "[due to patient's] explosive behavior that is unpredictable, I would suggest a work program [before] entering the work force. . . . [Patient] need to be referred to the Intensive Psychiatry Rehabilitation Program at [Rochester Mental Health Center] to build social skills in dealing [with] co-workers [and] situations that anger him." (192) Evans also reported that, "[patient] has had a chronic problem [with] sporadic angry outbursts.  For several [months] has not had a physical altercation until now.  Had a physical altercation of slapping an 18 yr. old in the face.  Said police intervened and [no] charges were brought." (188)  Evans stated that plaintiff had "poor insight into the seriousness of his anger", and was limited in his ability to follow detailed instructions, follow schedules, interact with co-workers, interact with the public, and respond appropriately to changes in the workplace. (191, 193)

On March 22, 2001, John Thomassen, Ph.D. ("Thomassen"), a non-treating examining psychologist, examined plaintiff. Thomassen reported:

> [Patient] stated that he is often sad for unknown reasons and has been sad for many years. He tends to withdraw from others. He is often angry for unknown reasons. He stated that he has been known to hit others and that he had hit another individual with a hammer about two months before the examination inflicting much injury to him. He could not say why he had done this.

(200) Thomassen noted that plaintiff's mood was "agitated", that his cognitive functioning was "estimated in the low average range", and that his judgment was "[q]uestionable as per his long history of legal infractions and problems with coworkers in the past." (201) Thomassen further wrote:

> Mr. Frost should be able to follow simple instructions, [and] do rote tasks under supervision. He may have some difficulties doing complex tasks due to frustration and tolerance problems. He is likely to have problems relating to coworkers and coping with stress.
> ***
> Mr. Frost appears to have significant difficulties managing his emotions, refraining from impulsive behaviors and getting along with people. He presents with ongoing anxiety and some degree of depression for which he is currently taking antianxiety and antidepressant medications. He also appears to have significant characterological difficulties and would likely need ongoing counseling and supports. His prognosis for the future is rather poor given his poor history to date of working and numerous legal infractions.

(203)

On October 16, 2002, Patil and Eklund completed another report, in which they stated that plaintiff had "moderate" limitations in his ability to carry out short, simple instructions, carry out detailed instructions, and made simple work-related decisions. (246) They further indicated that plaintiff had "extreme" limitations in his ability to interact appropriately with supervisors, co-workers, and the public, and to respond

5

appropriately to work pressures and changes in routines. (247) The report further stated: "[Patient's] behavior extremes associated [with] his primary [diagnosis] of intermittent explosive disorder interfere[s] [with] applying anger management skills during situations in the community. . . . [Patient has had] numerous physical altercations [with] citizens. Once incident caused him serious injury [requiring] an emergency splenectomy [on May 15, 2002]." (246-47) With regard to the splenectomy, the record reflects that after plaintiff had gotten into an argument with a man and punched him, the man struck plaintiff with a metal fence post, rupturing plaintiff's spleen. (260)  The record further notes that, following surgery, plaintiff, against his doctor's wishes, checked himself out of the hospital, because he was concerned that the man with whom he had fought was going to vandalize his apartment. (332) Approximately one month later, while plaintiff was still recovering from his surgery, he was involved in fight with another man, and sustained minor injuries. (289)

On January 27, 2003, Patil reported that  plaintiff was "moderately limited" in his ability to understand and remember instructions, and "very limited" in his ability to carry out instructions, interact appropriately with others, maintain socially appropriate behavior without exhibiting behavior extremes, and functioning at work at a consistent pace. (321)  Patil stated that, "[d]espite ongoing psychotherapy for anger management [and] pharmacotherapy for three years, [patient] still exhibiting behavior extremes." (322)

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence,

...

shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of this five-step sequential analysis, defendant may carry her burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are

exertional limitations.")  However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then defendant cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[4]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[4]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

## THE ALJ'S DECISION

At the first step of the five-step sequential analysis, the ALJ found that plaintiff had not engaged in any substantial work. At the second step, the ALJ found that plaintiff had severe impairments, namely: "late effects of incisional pain status post splenectomy, social phobia, intermittent explosive disorder, panic disorder, generalized anxiety, and antisocial personality disorder". (16)  However, at the third step, the ALJ found that these impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. At the fourth step of the sequential analysis, the ALJ found that plaintiff had the following residual functional capacity:

> [Is able to] lift and carry up to 50 pounds occasionally and sit, stand or walk for up to six hours a day in jobs requiring only simple instructions. None of the treating or examining physicians have indicated [that] the claimant had any physical limitations but the state agency review physicians stated that the claimant was limited to lifting and carrying 50 pounds occasionally for reasons that are unclear. Nonetheless, the [ALJ] give the claimant the maximum benefit of the doubt in adopting the state agency's opinion.

(19) (citations omitted). Notably, the only non-exertional impairment listed by the ALJ was that plaintiff was limited to jobs requiring simple instructions. The ALJ further found, at step four, that plaintiff had no past relevant work. At the fifth and final step of the sequential analysis, the ALJ found that plaintiff was able to perform "substantially all of the requirements of medium work." Ths ALJ then resorted to the "grids" to find that plaintiff was not disabled. (20)

It is significant that, in determining plaintiff's residual functional capacity, the ALJ essentially discounted the Patil's opinions. In this regard, while Patil concluded that

plaintiff had "extreme" limitations in his ability to interact with others, the ALJ found that opinion to be inconsistent with the progress notes in the file: "The treatment notes of Dr. Patil and Mr. Eklund demonstrate that between January 2001 and January 2003, the claimant was stable, at baseline, with only moderate symptoms, or improved [sic]." (17)

The ALJ also found plaintiff's testimony concerning his activities of daily living to be inconsistent with that of a person who was unable to work. (17-19) For example, the ALJ noted that plaintiff claimed to be able to support his heavy cigarette habit, as well as pay for gasoline and auto insurance, by selling junk that he found in dumpsters. (17-19)

## ANALYSIS

The primary issue before the Court is whether the ALJ's residual functional capacity assessment is supported by substantial evidence. As discussed above, the ALJ found that plaintiff had only one non-exertional impairment, namely an inability to follow other-than-simple instructions. Moreover, the ALJ found that this non-exertional impairment did not significantly erode plaintiff's ability to perform a full range of medium work. The ALJ rejected Dr. Patil's opinions that plaintiff would have significant difficulties interacting appropriately with supervisors, co-workers, and the public, responding appropriately to work pressures and changes in routines, and performing at a consistent pace, without exhibiting behavior extremes. In that regard, the ALJ relied upon various notes in the file, which he contended were inconsistent with Patil's opinions. However, the Court finds that the evidence upon which the ALJ relied (252, 264, 269, 271, 273, 276, 277, 281, 312) is not substantial evidence which would justify disregarding the opinions of Patil, plaintiff's treating psychiatrist.

For example, the ALJ cited to a report on October 16, 2001, stating that plaintiff was "showing marked improvement". The ALJ also pointed to a report on January 14, 2002, in which plaintiff reported that he was "doing well" on his then-current medications, and a report on April 8, 2002, in which plaintiff denied having any symptoms. (264, 271) However, the ALJ failed to consider that, a short time after these reports, plaintiff was involved in several fights. (260, 263, 289) The ALJ further cited a note by an RN on August 2, 2002, stating, in relevant part, that plaintiff's "impulse control" was good, without considering that, just one month prior, plaintiff had been involved in a fight while still recovering from his splenectomy surgery. Moreover, the ALJ cited to an April 11, 2000, report stating that plaintiff was "cognitively intact, attentive and not psychotic" (17), but failed to mention that the same report stated that plaintiff "requires little in the way of provocation to become enraged with explosive violent behaviors." (281) The ALJ seems to have discounted Patil's and Eklund's reports in part because they reflect that, during his office visits, plaintiff generally seemed "normal". However, it seems that the fact that Patil and Eklund did not personally witness any of plaintiff's assaultive behavior during his office visits does not necessarily detract from the weight of their conclusions. In that regard it appears undisputed that plaintiff has a long history of explosive and assaultive behavior, triggered by everyday frustrations that would not be present in a one-on-one meeting with a doctor or therapist.[5]

In addition, the Court believes that the ALJ failed to accurately depict the opinion

---

[5]There is no medical evidence in the record suggesting that someone with "intermittent explosive disorder" would be expected to exhibit aggressive or assaultive behavior during office visits.

of Dr. Thomassen. In that regard, while the ALJ referred in his decision to Thomassen's statement that plaintiff could "so simple tasks and follow simple instructions" (17), he failed to also mention Thomassen's opinion that plaintiff was "likely to have problems relating to coworkers and coping with stress," due to his "significant difficulties managing his emotions, refraining from impulsive behaviors and getting along with people." (202) Nor did the ALJ mention Thomassen's statement that plaintiff would "likely need ongoing counseling and supports", or his overall view of plaintiff's prognosis as being "poor". (203)

Consequently, the Court finds that, on the present record, the ALJ's determination regarding plaintiff's residual functional capacity, and specifically, the extent of plaintiff's non-exertional impairments, is not supported by substantial evidence.

## CONCLUSION

Defendant's motion for judgment on the pleadings [#10] is denied, and this matter is remanded, pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this Decision and Order.

So Ordered.

Dated: Rochester, New York
       March 17 2006

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge